ATHERTON et al. v. UNITED STATES.

EDWARDS et al. v. UNITED STATES.

Nos. 11582, 11586.

United States Court of Appeals
Ninth Circuit.

Aug. 5, 1949.

Francis Heisler, A. L. Wirin and Fred Okrand, Los Angeles, Cal., for appellants.

James M. Carter, U. S. Atty., Ernest A. Tolin, Chief Asst. U. S. Atty., Norman Neukom and Herschel E. Champlin, Asst. U. S. Attys., Los Angeles, Cal., for appellee.

Before DENMAN, Chief Judge and STEPHENS and ORR, Circuit Judges.

STEPHENS, Circuit Judge.

Twenty-one persons in camp as conscientious objectors to participation in war in any form were indicted and convicted on counts charging a knowing failure and neglect to perform certain duties required of them under the Selective Training and Service Act of 1940, 50 U.S.C.A. Appendix, § 301 et seq., hereinafter referred to as the Act. The appeals are consolidated.

Appellants were classified IV-E as conscientious objectors by their local Selective Service boards and were assigned to work of national importance at a Civilian Public Service Camp No. 76 at Glendora, California.

The Act provided for assignment of those so classified to do work of national importance under civilian direction. The President, by virtue of his authority under the Act, set up an operative agency headed by the Director of Selective Service. A number of Army officers were detailed for service with the Selective Service Head-

quarters. By virtue of Executive Order No. 8675, February 6, 1941, 6 Fed. Reg. 83, the Director of Selective Service was empowered to determine what constituted work of national importance, and to effectuate a plan to utilize the manpower under classification IV-E for that purpose. The Civilian Public Service System was established whereby camps were set up under control of a Camp Operations Division which administered the needs, personnel and supplies for each camp. The immediate directors for each of these camps and their assisting officers were civilians.

Experience in the handling of groups of men was available in the Army camps in regard to housing, food, clothing, discipline and general regulations, and this experience was used in the organization and operation of the civilian camps. Monthly payments in the sum of $5 were disbursed through the Army Chief of Finance, the appointed Fiscal Disbursing and Accounting Agent for the Director of Selective Service.

The camps were regulated and controlled by the Director of Selective Service and his subordinates in the Camp Operations Division including those in immediate control of the camp. The Director promulgated regulations for conduct of the camps, and operations thereof were ruled by the Camp Operations Division as set forth in a Manual for Camp Directors Government Operated Civilian Public Service Camps.

Appellants contend that they were required to perform work under military rather than civilian directors, contrary to the mandate in Section 5(g) of the Selective Training and Service Act of 1940, 50 U.S.C.A. Appendix, § 305(g).[1]

We are urged by appellants to find that Congress intended to keep completely separate the treatment of conscientious objectors from the government's military establishment, that the intention was circumvented in the appointment of and grant of authority to the Director of Selective Service and that Camp Glendora was wrongfully put under administrative and

---

[1] 50 U.S.C.A.Appendix § 305(g): "Nothing contained in this Act shall be construed to require any person to be subject combatant training and service in the land or naval forces of the United States who, by reason of religious training and belief, is conscientiously opposed to participation in war in any form. Any such person claiming such exemption from combatant training and service because of such conscientious objections whose claim is sustained by the local board shall, if he is inducted into the land or naval forces under this Act, be assigned to noncombatant service as defined by the President, or shall, if he is found to be conscientiously opposed to participation in such noncombatant service, *in lieu of such induction, be assigned to work of national importance under civilian direction.* Any such person claiming such exemption from combatant training and service because of such conscientious objections shall, if such claim is not sustained by the local board, be entitled to an appeal to the appropriate appeal board provided for in section 10(a) (2) [section 310(a) (2) of this Appendix]. Upon the filing of such appeal with the appeal board, the appeal board shall forthwith refer the matter to the Department of Justice for inquiry and hearing by the Department or the proper agency thereof. After ap-

propriate inquiry by such agency, a hearing shall be held by the Department of Justice with respect to the character and good faith of the objections of the person concerned, and such person shall be notified at the time and place of such hearing. The Department shall, after such hearing, if the objections are found to be sustained, recommend to the appeal board (1) that if the objector is inducted into the land or naval forces under this Act, he shall be assigned to noncombatant service as defined by the President, or (2) that if the objector is found to be conscientiously opposed to participation in such noncombatant service, he shall in lieu of such induction be assigned to work of national importance under civilian direction. If after such hearing the Department finds that his objections are not sustained, it shall recommend to the appeal board that such objections be not sustained. The appeal board shall give consideration to but shall not be bound to follow the recommendations of the Department of Justice together with the record on appeal from the local board in making its decision. Each person whose claim for exemption from combatant training and service because of conscientious objections is sustained shall be listed by the local board on a register of conscientious objectors." [Emphasis added.]

directive control of the Selective Service System through Camp Operations of National Selective Service Headquarters containing Army personnel.

The government claims that Section 5(g) is qualified by 50 U.S.C.A. Appendix, §§ 309a and § 310 of the Selective Service Act, wherein Congress delegated to the President power of administration for prescribing necessary rules and regulations to carry out the provisions of the Act. He was authorized to administer the Act and to delegate his authority to the Director of Selective Service, to utilize services of any and all departments, officers or agents of the United States as well as officers of the Military Services.

 We are of the opinion that appellants state the Congressional intent as to the separation of the military side and the civilian side of the government at war all too broadly. The constitutional power of the Government to prosecute a duly declared war to victory is very broad, as authorities hereinafter quoted will show. All resident persons enjoying the rights or privileges of the country may be required to assist in the war effort as the Chief Executive and the Congress may direct. Privileges granted by Congress to persons in defined situations or to persons holding religious conscientious objections to war are not to be construed so as to paralyze the governmental hand unless legislation compels it. We hold, and authorities will be cited to support our holdings, that it was not the Congressional intent to excuse the conscientious objector from all service which would tend to strengthen the government's war power nor was it the Congressional intent to bar the services, skill, experience, and organization of other governmental departments in setting up the organization and functions of conscientious objectors' camps, including the Army, Navy and Marine Corps. In order to accomplish the work of national importance, organization, discipline and operational controls were essential.

 The fact that the Civilian Public Service System contained Army officers on special duty with Selective Service Headquarters does not make the camps a part of the Army nor constitute them as military in character nor subject camp personage to military rather than civilian direction. Army officers are frequently assigned to civilian work and the evidence justifies the conclusion that the actual work of the camps was performed under civilian supervision and direction and not military direction. Persons assigned to the camps were in no way subject to the Articles of War and prosecutions for any violations by them were instituted in the United States district court. As Director of Selective Service, General Hershey is directly responsible to the President in pursuance of the terms of the Act. It is true that he was a general in the Army, however, by Special Order 231 of the War Department, he was detached from that Department and assigned to the Selective Service System and then appointed its Director with powers to act only in accordance with the provisions of the Act. He served in such capacity as a civil and not a military officer. Kramer v. U. S., 6 Cir., 147 F.2d 756.

Appellants rely upon Gibson v. U. S., 329 U.S. 338, 67 S.Ct. 301, 91 L.Ed. 331, and Girouard v. U. S., 328 U.S. 61, 66 S.Ct. 826, 90 L.Ed. 1084. However, nothing in these cases negatives the conclusion that the camps were under civilian direction, or suggests that such camps were under military rule and control.

 It is next claimed that the Selective Training and Service Act of 1940 did not authorize the setting up of restrictive confinement and detention camps, and that therefore appellant could not be guilty of violating illegal orders given therein.

Appellants argue that neither the Act, by the words "assigned to work of national importance under civilian direction", nor the Presidential Executive Order No. 8675, directing the Director of Selective Service to establish or designate work of national importance under civilian direction, authorizes the establishment of the camp system.

Establishing conscientious objectors' camps was a reasonable means of fulfilling the program entrusted to the President by Congress. Accomplishment of the work was of great importance in a period of national emergency and it had to be done efficiently and with speed. The men had to be assigned to places from which the work could be accomplished by groups. An organized and uniform system with the necessary facilities for the men to act was essential. See Weightman v. U. S., 1 Cir., 142 F.2d 188.

Another of appellants' contentions is that the action taken under the Act compels them to perform work without compensation and is involuntary servitude violative of the Thirteenth Amendment to the United States Constitution. U.S.C.A. Constitution, Amendment XIII.

In the Selective Draft Law Cases, Arver v. U. S., 245 U.S. 366, at page 390, 38 S.Ct. 159, 165, 62 L.Ed. 349, L.R.A.1918C, 361, Ann.Cas.1918B, 856, the Supreme Court states that: " * * * as we are unable to conceive upon what theory the exaction by government from the citizen of the performance of his supreme and noble duty of contributing to the defense of the rights and honor of the nation as the result of a war declared by the great representative body of the people can be said to be the imposition of involuntary servitude in violation of the prohibitions of the Thirteenth Amendment, we are constrained to the conclusion that the contention to that effect is refuted by its mere statement."

So, also, does this extend to the work of conscientious objectors for work of national importance during war. See United States v. Van Den Berg, 7 Cir., 139 F.2d 654, 656; Butler v. Perry, 240 U.S. 328, 333, 36 S.Ct. 258, 60 L.Ed. 672; United States v. Mroz, 7 Cir., 136 F.2d 221, 227.[2]

■ It is fundamental that Congress can compel appellants to participate in national defense, and a requirement to perform work of national importance in lieu of induction into military service can not be said to controvert the Thirteenth Amendment. Heflin v. Sanford, 5 Cir., 142 F.2d 798.

■ Reversal is asked upon the asserted ground that Section 5(g) of the Act fails to set forth standards as to what "work of national importance" shall be, and that therefore Congress unconstitutionally delegated its powers, and appellants cite A. L. A. Schechter Poultry Corp. v. United States, 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570, 97 A.L.R. 947; Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834; and Ex parte Mitsuye Endo, 323 U.S. 283, 65 S.Ct. 208, 89 L.Ed. 243.

■ We hold that a sufficient standard of action is provided in the Act by the words "Work of National Importance." The Act is a war measure and it is clear that "Work of National Importance" means not all work but work which will assist in the preservation of the nation by winning the war. The standard is as broad as, but no broader than, the necessities arising under the vicissitudes of war. The intention of the Congress could not have been carried on through any limitation upon the requirement that conscientious objectors be excused from military duty. The immunity was not unlimited and the Government still required a duty of them in the multitudes of civil business connected with the war. No practical break down of just what would be work of national importance could have been written in the Act. United States v. Van Den Berg, 7 Cir., 139 F.2d 654; Weightman v. United States, 1 Cir., 142 F.2d 188; Kramer v. United States, 6 Cir., 147 F.2d 756,

---

[2] As stated by the 7th Circuit in United States v. Mroz, 136 F.2d 221, 227, "He [conscientious objector] received all the consideration the emergency of the situation permitted, and the administrative tribunals' decisions have placed him in a category where his valued life is safer than that of many of his fellow citizens. We are confident (at least we are hopeful) that mature reflection will cause a modification of counsel's opinion of the Selective Service Act and its administration. It is hard to conceive of any government at war dealing more considerately with its citizens who express conscientious objections to war * * *".

certiorari denied 324 U.S. 878, 65 S.Ct. 1026, 89 L.Ed. 1429; Wolfe v. United States, 6 Cir., 149 F.2d 391. Furthermore, appellants do not dispute that the work to which they were assigned was "of national importance." A litigant can be heard to question the constitutionality of a statute only when and in so far as he at least claims to be damaged by its operation. Alabama State Federation of Labor, etc., v. McAdory, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725, and the cases cited therein.

██ In Hirabayashi v. United States, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774, it was pointed out that the Constitution commits to the President and to the Congress the exercise of the war power in all the vicissitudes and conditions of war, and of necessity a wide scope of discretion and judgment is granted. The power to wage war successfully is not limited to combat action but extends to every matter and activity related to war which affects its conduct and progress.

In Kramer v. United States, supra, 147 F.2d at page 759, it is said, "The Supreme Court has declared that legislation must be often adapted to conditions involving details with which it is impracticable for the legislature to deal directly; and that the Constitution does not deny to Congress 'the necessary resources of flexibility and practicality, which will enable it to perform its function in laying down policies and establishing standards, while leaving to selected instrumentalities the making of subordinate rules within prescribed limits and the determination of facts to which the policy as declared by the Legislature is to apply.' Currin v. Wallace, 306 U.S. 1, 15, 59 S.Ct. 379, 387, 83 L.Ed. 441; Panama Refining Co. v. Ryan, 293 U.S. 388, 421, 55 S.Ct. 241, 79 L.Ed. 446. See also Wayman v. Southard, 10 Wheat. 1, 43, 6 L.Ed. 253; McKinley v. United States, 249 U.S. 397, 39 S.Ct. 324, 63 L.Ed. 668."

██ It is further alleged by appellants that requiring them, as a condition of exemption from the Armed Forces, to perform work of national importance was a denial of due process within the Fifth Amendment for no such condition was placed on other exemption cases.

In the first place, the requirement that conscientious objectors shall do work of national importance is not a condition for their exemption from military duty. It is a recognition of a religious tenet by a people's government which respects honest religious beliefs even though they are out of the general pattern. And it has been properly held on many occasions that the required performance of work of national importance after exemption from military service was reasonable and not without due process even though there be deferment or exemption of persons subject to military service without such conditions attached. See Local Draft Board No. 1 of Silver Bow County, Montana et al., v. Connors, No. 9937, 9 Cir., 124 F.2d 388; Roodenko v. United States, 10 Cir., 147 F.2d 752, certiorari denied 324 U.S. 860, 65 S.Ct. 867, 89 L.Ed. 1418, rehearing denied 324 U.S. 891, 65 S.Ct. 1022, 89 L.Ed. 1438.

The law as applied to appellants does not constitute discrimination or class legislation nor is it unfair to appellants' rights and liberties. See Wolfe v. United States, 6 Cir., 149 F.2d 391; Roodenko v. United States, supra.

██ It is strongly urged that appellants, in being forced to work in the camp without pay and being unable to earn a livelihood, were deprived of liberty and property without due process of law. Such a contention has no merit. Practically, the system for conscientious objectors does deprive them of full liberty and requires them to work at a rate of compensation far below what they could earn, but this does not deprive them of their constitutional rights. Weightman v. United States, 1 Cir., 142 F.2d 188; Brooks v. United States, 2 Cir., 147 F.2d 134. Men eligible for military service can be conscripted for duty without compensation and it follows that men conscripted for work of national importance can be likewise conscripted. The appellants were allowed a small sum for toilet articles and were provided with food, shelter, hospitalization and recreational facilities.

It is argued by appellants that the power to draft for military purposes does not include the power to draft for civilian purposes. The contention is made that the Constitution provides only for the raising of an army and does not permit drafting for other purposes.

Drafting for civilian work was an important aid to the defense and welfare of the country during the war, and a necessary fulfillment of the powers granted under the Constitution. It has been stated by this 9th Circuit that Congress has the power to call everyone to the colors and that no one within the jurisdiction of the United States is exempt except through Congressional allowance. Local Draft Board No. 1 of Silver Bow County, Montana et al. v. Connors, 9 Cir., 124 F.2d 388; Roodenko v. United States, supra; Weightman v. United States, supra.[3]

It is finally stated by appellants that to place a penalty upon the exercise of appellant's religious belief is to violate his right to freedom of worship contrary to the First Amendment. The answer to this is that no penalty is attached. The claim is made also that the failure to compensate appellants imposed a condition to the exercise of conscience. How or in what manner such a conclusion could be reached we do not know. The setting up of the camp system and requiring work without pay have no bearing whatever on the right of the conscientious objectors to follow their religious beliefs. Appellants were allowed freedom of worship, to attend services of their choice, and no interference therewith existed.

There is no evidence of any burden on their religious thought or belief or any religious practice, although they could not fasten their political or religious beliefs upon others to the prejudice of the operation and discipline or good order of the camp. See Selective Draft Cases, Arver v. U. S., 245 U.S. 366, 390, 38 S.Ct. 159, 62 L.Ed. 349, L.R.A.1918C, 361, Ann.Cas. 1918B, 856; Hopper v. United States, 9 Cir., 142 F.2d 181, 186; Roodenko v. United States, supra; Weightman v. United States, supra.

Affirmed.

---

3 In Brooks v. United States, 2 Cir., 147 F.2d 134, it is stated: "The federal government in the exercise of its undoubted power to raise and maintain armed forces for the protection of the country could have disregarded the appellant's conscientious scruples against participating in such service and conscripted him for any military service for which he was mentally and physically fit. United States v. Macintosh, 283 U.S. 605, 622, 623, 51 S.Ct. 570, 75 L.Ed. 1302. Having respected his conscientious objection to all such service, even to the extent of granting him exemption from non-combatant duty, Congress could in the exercise of its incidental power do whatever was reasonably necessary and appropriate to raise and maintain armed forces provided that those who were given exemption from such service be required to perform such work of national importance as they were able to perform under reasonable rules and regulations. There are many good reasons which may have led Congress so to provide but it is enough that such action may have been considered needed during a great national emergency for its effect upon the morale of those who do serve in the armed forces. As was said in United States v. Schwimmer, 279 U.S. 644, 651, 49 S.Ct. 448, 450, 73 L.Ed. 889, 'The influence of conscientious objectors against the use of military force in defense of the principles of our government is apt to be more detrimental than their mere refusal to bear arms.'"